## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**HENRY CONNER,**

    **Plaintiff,**

**v.**                       **CASE NO. 3:20-cv-5263-TKW-EMT**

**CENTURION OF FLORIDA,
LLC and MHM HEALTH
PROFESSIONALS, LLC f/k/a
MHM HEALTH PROFESSIONALS,
INC.,**

    **Defendants.**

_____/

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Centurion of Florida, LLC ("Centurion") and MHM Health Professionals, LLC ("MHMHP") (collectively, "Defendants"), by and through their undersigned counsel and pursuant to Fed.R.Civ.P. 56, hereby move for summary judgment. The grounds upon which the instant motion is based are set forth in the following Supporting Memorandum of Law.

## SUPPORTING MEMORANDUM OF LAW

## I.

## STATEMENT OF FACTS

**A.    Background**

1.     Centurion maintains a contract with the Florida Department of Corrections ("FDOC") for the provision of comprehensive inmate health services. Centurion subcontracts with MHMHP, which provides staffing of healthcare providers.  [Doc. 29-30, ¶ 3].

2.     Security Officers are employees of the FDOC.  [Doc. 29-1, 57:24-58:2]. FDOC Security Officers are not employees of MHMHP or Centurion. [Doc. 29-1,58:2-5].

3.     On April 4, 2016, Plaintiff Henry Conner ("Conner") was offered employment with MHMHP as a Mental Health Professional ("MHP").  [Doc. 29-1, 41:17-19; Doc. 29-3].  Conner does not know who made the decision to hire him. [Doc. 29-1, 51:1-6].

4.     As a part of Conner's duties as an MHP, Conner completed behavioral/mental health assessments, provided regular follow-up to assigned patients to monitor their current mental status and functioning, provided crisis interventions with daily follow-up as needed, conducted individual and group counseling and observed patients to detect psychiatric symptoms, mental

deficiencies, abnormal behavior or maladjustment.  [Doc. 29-1, 52:24-53:20; Doc. 29-5].

5.     Conner was assigned to work at Santa Rosa Correctional Institution ("SRCI").  [Doc. 29-1, 42:2-5].

6.     While assigned at SRCI, Conner reported to Dr. Ginger Spaulding ("Dr. Spaulding").  [Doc. 29-1, 53:21-23].  Conner also reported to Katy Hall ("Hall") administratively.  [Doc. 29-1, 55:13-16].

7.     Conner was assigned to the J-Dorm in the Annex of SRCI as of October 2018.  [Doc. 29-1, 56:4-8].  Conner remained in the J-Dorm for the duration of his employment at SRCI.  [Doc. 29-1, 55:17-56:8].

8.     Conner was a salaried employee making $47,500 annually, which remained the same throughout his time at SRCI.  [Doc. 29-1, 51:7-12].

**B.     October 9, 2018 Incident**

9.     On October 15, 2018, Lauren Gaylord ("Gaylord"), an Activities Counselor, submitted an FDOC Incident Report, in which she reported that, on October 9, 2018, she "noticed through an unobstructed view a noose made of toilet paper hanging from the roll on the railing."  [Doc. 29-1, Doc. 29-6].

10.     Gaylord reported this to her supervisor, Dr. Spaulding, on October 11, 2018.  [Doc. 29-1, Doc. 29-6].

*ACTIVE 53512988v1*

11.     Conner did not see the noose.  [Doc. 29-1, 66:6-9].

12.     The Officer who allegedly made the noose, Office Hollis, was removed from the dorm. [Doc. 29-1, 79:12-15, 84:15-20, 87:2-5; Doc. 29-7].  Officer Hollis was removed by no later than October 12, 2018.  [Doc. 29-1, 79:12-15, 84:15-20, 87:2-5; Doc. 29-7].

13.     Conner cannot identify any acts of racism or retaliation that Officer Hollis committed after he was removed from the dorm.  [Doc. 29-1, 74:19-75:11].

14.     While Officer Hollis was removed from the dorm in which Conner worked, J-Dorm, following this incident, Conner thought that the Officer should have been terminated.  [Doc. 29-1, 90:2-12].

15.     Conner participated in numerous meetings with MHMHP Management and FDOC Management in which they discussed this incident.  [Doc. 29-1, 79:16-80:25, 82:5-83:5].

**C.    April 2019 Incident And Meeting**

16.     In or around April 2019, Conner learned that Officer Hollis had not been terminated. [Doc. 29-1, 119:16-120:1].  Conner saw the Officer doing a training event and subsequently "voiced his concerns" that the Officer should have been fired for a "hate crime."  [Doc. 29-1, 90:2-16].

17.     At some point in April 2019, Conner had a conversation with Sarah Brus ("Brus"), MHMHP's Human Resources Business Partner for the Region in

which SRCI located, in which he informed her about "the noose incident and the fact that there was nothing being done about it and that we still felt that our safety was in danger." [Doc. 29-1, 117:13-21].   Conner also "verbalized the unfairness of having to work in a hostile work environment" to his supervisors and the warden. [Doc. 29-1, 118:18-22].

18.    Also in April 2019, Conner claims that his co-worker Betty Young ("Young") was retaliated against.  [Doc. 29-1, 81:1-22].  Conner believed Young had witnessed an inmate being beat, filed a report, and was suspended and terminated as a result.  [Doc. 29-1, 92:21-93:4].  However, Conner did not see this incident. [Doc. 29-1, 93:17-19].  Moreover, in her written statement, Young did not state that she had witnessed the inmate being assaulted.  [Doc. 29-1, 102:24-103:9; Doc. 29-10].

19.    The inmate who was allegedly assaulted and the nurse who was present both submitted statements saying that the inmate fell off the table and was not assaulted.  [Doc. 29-11, Doc. 29-12].

20.    Conner admits that, at the time he testified that he believed Young had been retaliated against, he did not have all the information about the situation.  [Doc. 29-1, 106:5-11].

21.    On April 22, 2019, a meeting was held with the Annex Mental Health Department.  [Doc. 29-1, 90:2-91:25; Doc. 29-15].  The meeting included the FDOC

Warden, Hall, Spaulding, Kristal Ake ("Ake"), Regional Director for MHMHP, as well as other members of the FDOC Staff and the MHPs.  [Doc. 29-1; Doc. 29-15]. The meeting was held to discuss the MHPs' concerns.  [Doc. 29-1, 90:2-91:25].

22.     During this meeting, Ake informed the staff that some individuals felt uncomfortable in the breakroom due to "heated conversations taking place in the lunch room, condescending remarks made with loud tone of voices, with some staff no longer feeling comfortable to eat lunch in that area." [Doc. 29-1, 122:15-19, Doc. 29-15].

23.     Conner believes the meeting was retaliatory because they discussed "how reports and stuff are being filed inappropriately and everything like that and [he] was led to believe that this is what the meeting was about."  [Doc. 29-1, 90:2-91:25].  Conner considered the meeting "disciplinary." [Doc. 29-1, 90:2-91:25].

24.     Nevertheless, Conner repeatedly admits he was never disciplined during his employment at MHMHP. [Doc. 29-1, 57:13-15, 111:15-18].

25.     Following the meeting, Conner received a letter from the Warden detailing the procedure for reporting incidents and explaining how they would be investigated.  [Doc. 29-1, 128:23-129:13; Doc. 29-17].

*ACTIVE 53512988v1*

26.     On April 23, 2019, Conner submitted a written complaint to MHMHP's Human Resources alleging "hostile work environment" and "retaliation" as a result of the April 22, 2019 meeting.  [Doc. 29-14].  The complaint alleged, in part:

> I felt that I was ambushed, threaten, and marginalized even more as an African American and a professional following this meeting. I believe that this "meeting" was a form of retaliation due to my verbalizing the unfairness of having to work in an hostile environment. By appearance and definition, I believe that this was a form of intimidation/bullying…

[Doc. 29-14].

**D.     July 4th Incident**

27.     In July 2019, Conner learned of an incident involving another co-worker, Darsell Harris ("Harris"), that he believed was retaliatory and/or racist. [Doc. 29-1, 87:14-24].

28.     Conner was on vacation the day the incident allegedly occurred. [Doc. 29-1, 131:2-4].

29.     When Conner returned from vacation, Harris informed him that she had had a disagreement with FDOC Officers about the time her group ended, and the FDOC officers "had threatened to lock her up in the room and beat the crap out of her." [Doc. 29-1, 132:22-133:19].

30.     The alleged incident was first reported to management on July 9, 2019. [Doc. 29-1, 135:7-14].

*ACTIVE 53512988v1*

31.     On or before July 10, 2019, FDOC removed the Officers from the J-Dorm as a result of this incident.  [Doc. 29-1,149:14-25; Doc. 29-21].

**E.     Walkout, Suspension and Transfer**

32.     On July 11, 2019, some of the SRCI MHPs requested a meeting with their supervisors to address what they asserted was a hostile work environment. [Doc. 29-1, 141:8-10].

33.     Dr. Spaulding left the meeting early because she felt like she was being verbally attacked by the MHPs.  [Doc. 29-1, 144:11-14].

34.     Shortly after the meeting, Conner told Ms. Hall "we will be leaving for the day." [Doc. 29-1, 145:19-146:1].  Conner's reason for leaving was, at least in part, "to protest the environment." [Doc. 29-1, 146:21-25].

35.     Six other MHPS (Harlan Wallner, Tanya McIntyre, Tracy Bowen, Jillian Bradsell, Henry Conner and Clifton Richard) also walked out of the facility after this meeting.  [Doc. 29-1, 163:2-12].

36.     Conner does not know whether his scheduled patients were seen after he left the facility.  [Doc. 29-1, 156:18-25].

37.     All MHPs assigned to the J Dorm on July 11, 2019 left the facility following the meeting.  [Doc. 29-1, 163:8-12].

38.     On July 12, 2019, Conner returned to SRCI and was informed he had been suspended without pay pending an investigation.  [Doc. 29-1, 153:2-20].

8

39.     On or after July 16, 2019, Conner received a suspension letter stating that he had been placed on suspension without pay effective July 12, 2019 pending the completion of an internal investigation as a result of walking off the job and abandoning his patients on July 11, 2019.  [Doc. 29-1, 157:1-9; Doc. 29-22].

40.     All of the other MHMHP employees who walked off the job on July 11, 2019, Wallner, McIntyre, Bowen, Bradsell, Conner, and Richard were also suspended.  [Doc. 29-1, 163:2-19].  McIntyre, Bowen, Bradsell, Conner and Richard are black but Wallner is not.

41.     All of the individuals who walked out on July 11, 2019 were suspended and offered transfers to other facilities.  [Doc. 29-1, ¶ 7].

42.     Conner is not aware of any other individual who walked out on their shift and left their patients uncared for, but was not suspended.  [Doc. 29-1, 161:24-162:2].

43.     On July 25, 2019, Conner had a telephone conversation with Brus and MHMHP's H.R. Manager, Lisa Lynch ("Lynch"), in which he informed them he did not feel safe at SRCI.  [Doc. 29-1, 160:8-161:9; Doc. 29-23].

44.     Thereafter, Conner had a conversation with Lynch and Victoria Love ("Love"), MHMHP's Vice President of Operations, in which he was offered a transfer to Century Correctional Institution ("Century").  [Doc. 29-1, 164:4-11].

45.     Transferring Conner to Century was necessary because Conner told Lynch and Brus that he did not feel safe working at SRCI.  [Doc. 29-1, 148:9-13; 160:8-18].

46.     Conner did not accept the transfer.  Rather, on August 1, 2019, Conner submitted his resignation.  [Doc. 29-1, 165:7-15, Doc. 29-24].

47.     Love was the ultimate decisionmaker with regard to Conner's suspension and transfer.  [Doc. 29-30, ¶ 8].

48.     Love's decision to suspend Conner was not based on any retaliatory animus.  [Doc. 29-30, ¶ 9]

49.     Love's decision to suspend Conner was not based on any racial animus. [Doc. 29-30, ¶ 10]

50.     Instead, Love made the decision to suspend Conner because he walked out of the institution and abandoned his post and patients.  [Doc. 29-30, ¶ 6]

51.     Love made the decision to offer Conner the transfer to Century because Conner indicated that he did not feel safe returning to SRCI.  [Doc. 29-30, ¶ 11]

52.     Love's decision to offer Conner the transfer was not based on any retaliatory animus.  [Doc. 29-30, ¶ 12]

53.     Love's decision to offer Conner the transfer was not based on any racial animus.  [Doc. 29-30, ¶ 13].

*ACTIVE 53512988v1*

**F.**    **Conner's Claims**

54.    Conner claims the April 22, 2019 meeting and July 2019 suspension without pay were acts of retaliation and racism.  [Doc. 29-1, 76:7-77:19].

55.    Conner admits that no one ever made any racist comments to him during his employment at MHMHP.  [Doc. 29-1, 58:15-18].  Conner also admits that he does not recall overhearing any racist comments during his employment at MHMHP.  [Doc. 29-1, 58:19-21].

56.    Conner admits that none of his supervisors made any statements indicating a retaliatory animus towards him.  [Doc. 29-1, 61:5-12].

57.    Conner also admits that Lynch, Brus, and Love did not make any statements showing any retaliatory motive.  [Doc. 29-1, 61:22-62:1; 62:8-11; 64:14-17].  However, Conner claims that Lynch, Brus, and Love demonstrated a "lack of a statements to basically show support for their employees."  [Doc. 29-1, 58:19-21, 61:22-62:1, 62:8-11, 64:14-17].

58.    Conner admits that he did not ever have any concerns with how his supervisors "treated [him] specifically."  [Doc. 29-1, 59:16-22].  However, Conner claims he had "a little bit of concern" with "the way the situation was treated." [Doc. 29-1, 59:16-22].

59.    Conner admits that no one at MHMHP subjected to him to acts of racism following the alleged noose incident.  [Doc. 29-1, 75:12-17].  Instead, Conner

11

"consider[s] retaliation from [his] complaints as an act of racism itself." [Doc. 29-1, 75:12-21].

## II.

## ARGUMENT

### A.   Summary Judgment Standard

One of the primary purposes of summary judgment is to isolate and dispose of factually unsupported claims.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986).   To that end, the United States Supreme Court has held that the plain language of Rule 56(c) of the Federal Rules of Civil Procedure:

> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no "genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Id.* at 322-23.

The party opposing summary judgment may not simply rest upon mere allegations or denials, but must make a sufficient showing to establish the existence of an essential element to the party's case, and on which the party will bear the burden of proof at trial.  *Celotex Corp.,* 477 U.S. at 323-24; *Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir. 1989).  If the nonmovant "fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the nonmovant, to

support a jury finding for the nonmovant, summary judgment may be granted." *Lurvey v. Metropolitan Dade County,* 870 F. Supp. 1570, 1575 (S.D. Fla. 1994) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254-55 (1986)). The burden on the nonmoving party is substantial; a mere scintilla of evidence is insufficient to defeat a motion for summary judgment. *Canty v. Bottacchi, S.A. de Navegacion,* 849 F. Supp. 1552, 1553 (S.D. Fla. 1994) (*citing Anderson,* 477 U.S. at 251-52).

## A.   Count I – Race Discrimination

### 1.   Conner cannot show that he was subjected to disparate treatment based on his race.

When a plaintiff relies on circumstantial evidence to prove a race discrimination claim under Title VII[1], under *McDonnell-Douglas*, a plaintiff must establish a *prima facie* case of discrimination. A *prima facie* case of discrimination consists of proof that (1) the plaintiff is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly-situated individual outside of his protected class. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Maynard v. Bd. of Regents of Div. of Fla. Dept. of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

---

[1] Section 1981 and FCRA claims are also evaluated under the *McDonnell Douglas* burden-shifting framework. *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009); *Gossard v. JP Morgan Chase & Co.*, 612 F. Supp. 2d 1242, 1252 (S.D. Fla. 2009).

Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate business reason for its employment decision, and the plaintiff must show that reason is mere pretext for unlawful discrimination.  "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."  *Hudson v. Blue Cross Blue Shield of Alabama*, 431 Fed. Appx. 868, 869 (11th Cir. 2011) (*quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).

"Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."  *Chapman v. AI Transp*., 229 F.3d 1012, 1030 (11th Cir. 2000).   The Court "must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered reason so that a reasonable factfinder could conclude that it is unworthy of credit."  *Jefferson v. Burger King Corp*., 505 Fed. Appx. 830, 834 (11th Cir. 2013).

**2.  <u>The only potential adverse action is Conner's suspension.</u>**

Not all conduct of an employer that negatively affects an employee constitutes an adverse employment action.  *Davis v. Town of Lake Park, Fla*., 245 F.3d 1232, 1238 (11th Cir. 2001).  Instead, there must have been a serious change to the terms

and conditions of plaintiff's employment. *Id.* Corrective action must result in a change of the terms and conditions of employment such as reduction in pay, benefits, or responsibilities. *See Manley v. DeKalb County Georgia*, 587 Fed. Appx. 507, 513 (11th Cir. 2014).

Here, the only potential adverse action is Conner's suspension.[2] Conner's proposed transfer to Century cannot be an adverse employment action because it was never accepted and never actually occurred.[3] *See Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1300 (11th Cir. 2007) (holding that an "offer to transfer an employee . . . is not an employment action; it is merely an offer"); *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 108 (E.D.N.Y. 2011) (a suggestion that the plaintiff transfer to a different position or even a plan to transfer the plaintiff did not constitute a tangible employment action because the transfer never actually occurred); *Duhe v. U.S. Postal Service*, No. 03-cv-746, 2004 U.S. Dist. LEXIS 3737, 2004 WL 439890, *11 (E.D. La. Mar. 9, 2004) (because the

---

[2] The April 22, 2019 cannot constitute an adverse employment action because it did not result in any change to the terms and conditions of Conner's employment. Conner admits he was never disciplined, and his characterization of the meeting as a "disciplinary" meeting does not demonstrate any change to the terms and conditions of his employment. *Davis*, 245 F.3d at 1238.

[3] Even if the transfer offer was an adverse action, Conner's claims of discrimination and retaliation still fail because MHMHP had a legitimate business reason to transfer him because he did not feel safe at SRCI, and Conner cannot show that this reason is pretextual. To the contrary, he repeatedly admits he said he did not feel safe at SRCI, and Ms. Love made the decision to transfer him on that basis.

15

plaintiff "was simply offered a lateral transfer in an attempt to remedy the harassment, and she was subject to no adverse consequences for rejecting that offer, [she] cannot raise any genuine issue of material fact with respect to whether a 'tangible employment action' or 'constructive discharge' occurred").

### 3. <u>Conner cannot identify anyone similarly situated who was treated more favorably.</u>

Conner's suspension claim fails on the fourth prong of his *prima facie* case because he cannot identify any comparators who engaged in similarly conduct and were not disciplined in the same manner.

In order to establish a "similarly situated" comparator, a plaintiff must show that he and the comparator "similarly situated in all material respects." *Lewis v. City of Union, GA*, 918 F.3d 1213 (11th Cir. 2019) (*en banc*).  This means that a comparator must have "engaged in the same basic conduct (or misconduct) as the plaintiff, . . . will have been subject to the same employment policy, guideline, or rule as the plaintiff, . . . will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff, and . . . will share the plaintiff's employment or disciplinary history[.]" *Id.*

Here, Conner walked out on mentally ill inmate patients. Conner cannot identify anyone else who walked out on their shift and left their patients uncared for, but who was not suspended.  Moreover, Conner was treated in the same manner as every other individual who walked out on July 11 and admits that all who walked

16

out on July 11 were suspended, including an employee outside his protected class. Conner simply has not identified any individual, who was similarly situated, and outside of his race, that walked out on his or her patients without notice and was not suspended.

Conner cannot establish a *prima facie* case because he cannot identify any similarly situated comparator as defined in *Lewis v. City of Union, supra.* Therefore, because Conner cannot establish a *prima facie* case, "summary judgment is appropriate." *McQueen v. Ala. DOT.*, 2019 U.S. App. LEXIS 11778 (11th Cir. 2019) (*citing Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997)).

### 4. **MHMHP had a legitimate business reason for Conner's suspension.**

Assuming *arguendo* that Conner could establish a *prima facie* case, which Defendants deny, the burden shifts to Defendants to provide a legitimate, non-discriminatory reason for any alleged adverse action.

Conner was suspended following walking out on his patients and leaving the facility without making arrangements for the care of his patients. Such behavior was unprofessional and endangered his patients. *See Hatfield v. Bio-Medical Applications of Ala., Inc.*, 2012 U.S. Dist. LEXIS 138361 (M.D. Ala Sept. 4, 2012) (plaintiff's violations of policies and procedures and endangering patient safety a legitimate business reason for termination); *see also Dougherty v. Mem'l Sloan-Kettering Cancer Ctr.*, 2002 U.S. Dist. LEXIS 13216 (S.D. N.Y. July 16, 2002)

(Plaintiff's errors that could have endangered patients' health and safety were a legitimate basis for termination).

**5.  <u>Conner cannot demonstrate pretext.</u>**

Conner cannot demonstrate that MHMHP's legitimate and nondiscriminatory reasons for his suspension were mere pretext. *See Chapman v. A-1 Transport*, 229 F.3d 1012 (11th Cir. 2000) (*en banc*); *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) ("[i]t matters not whether [a plaintiff] has made out a *prima facie* case if [ ] he cannot create a genuine issue of material fact as to whether [the defendant]'s proffered reasons for firing h[im] are pretext masking discrimination").

To show pretext, Conner must offer evidence showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal marks omitted).  Mere assertions of speculation regarding a "discriminatory motive is insufficient." *Turner v. Inzer*, 2012 U.S. Dist. LEXIS 137847, at *5 (N.D. Fla. Sept. 26, 2012) (*citing* E*dwards v. Acadia Realty Trust, Inc.*, 141 F. Supp. 2d 1340, 1346-47 (M.D. Fla. Mar. 9, 2001)); *see also Brown v. Progress Energy*, 364 Fed. Appx. 556, 558 (11th Cir. 2010).

*ACTIVE 53512988v1*

Conner cannot establish pretext unless he shows both that the reasons were false and that discrimination was the real reason for his adverse employment actions. *St. Mary's Honor Ctr.*, 509 U.S.C. at 515; *Flowers v. Troup Cnty. Sch. Dist.*, 803 F.3d 1327, 1339 (11th Cir. 2015) ("[c]ontradicting the [employer]'s asserted reason alone…no longer supports an inference of unlawful discrimination"); *Brooks v. County Comm'n*, 446 F.3d 1160, 1163 (11th Cir. 2006) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race…[A] plaintiff may not establish that an employer's proffered reasons are pretextual merely by questioning the wisdom of the employer's reasons, at least not where…the reason is one that might motivate a reasonable employer." (citation omitted)).  Thus, to show that a defendant's proffered reason is pretext, the plaintiff must "present concrete evidence in the form of specific facts…" *Earley v. Champion Int'l Corp.*, 907 F.3d 1077, 1081 (11th Cir. 1990) (emphases added).

Here, Conner was suspended for walking out on his patients along with six other MHPs.  He was thereafter offered a transfer because he stated he did not feel safe returning to SRCI.  Conner admits that he was insistent in his belief that he did not feel safe working at SRCI.  When questioned in deposition about the basis for his race discrimination claim, Conner claimed that he considered alleged retaliation to be the same as race discrimination, and that it was really a "lack of" statements in

19

action.  However, this testimony falls well short of meeting Conner's burden of proving that the legitimate reasons for his suspension were both false and pretextual. *See Phuong Nguyen v. Ga. Power Co.*, 2013 U.S. Dist. LEXIS 10773 (S.D. Ga. 2013) (granting summary judgment in favor of defendant because it provided a legitimate and nondiscriminatory reason that plaintiff could not prove was both false and pretextual).

In addition, Conner cannot show that he prearranged for the care of his patients before he left the facility on July 11th.  He also cannot prove that MHMHP took different actions against white employees.  Accordingly, Conner cannot establish that both MHMHP's reasons were false and that race discrimination was the real reason for his suspension. Therefore, summary judgment should be granted in MHMHP's favor on Conner's race discrimination claims.

## B.    Count II – Retaliation

To state a claim for retaliation under Title VII, the plaintiff must show "(1) [h]e engaged in statutorily protected expression; (2) that [h]e suffered an adverse employment action; and (3) that there is some causal relation between the two events."  *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008) (quotation omitted).

Following the Supreme Court's decision in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 133 S.Ct. 2517, 186 L. Ed. 2d 583 (2013),

a plaintiff must show more than temporal proximity between the protected activity and his or her adverse action to satisfy the causation element of a *prima facie* case of retaliation.  Instead, a plaintiff must establish that his or her protected activity was a "but-for" cause of the adverse action by the employer.  *Nassar*, 133 S.Ct. at 2534.

The "but-for" cause element "requires a closer link than mere proximate causation, it requires that the proscribed animus have a determinative influence in the employer's adverse decision." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335-36 (11th Cir. 2013).  *See also Smith v. City of Fort Pierce*, 565 Fed. Appx. 774 (11th Cir. 2014) (to establish a prima facie case of retaliation, a plaintiff must offer evidence from which a reasonable jury might conclude that an employer's retaliatory animus was the "but-for" cause of the adverse action).

If Conner establishes a *prima facie* case, the burden shifts to Defendants to provide a legitimate, non-retaliatory reason for the adverse action.  *E.E.O.C. v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993).   Once Defendants provided such a reason, the burden then shifts back to Conner to prove, by a preponderance of the evidence, that the reason was not a true reason, but merely pretext for retaliation.  *Meeks v. Computer Associates Int'l.*, 15 F.3d 1013, 1019 (11th Cir. 1994).

Pretext means more than inconsistency; pretext is "a lie, specifically a phony reason for some action." *Brown v. Sybase, Inc.*, 287 F.Supp.2d 1330, 1340 (S.D.

*ACTIVE 53512988v1*

Fla. Sept. 23, 2003) (*quoting Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1261 (11th Cir. 2001)).  Whether the reason provided by MHMHP for suspending and transferring Conner was pretext for retaliation must be established by Conner through "significantly probative evidence." *Johnson v. Atlanta Indep. Sch. Sys.*, 137 Fed. Appx. 311, 315 (11th Cir. 2005); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (citations omitted).

Conner cannot meet his burden "by simply quarreling with the wisdom of that reason."  *Wood v. Calhoun Cty. Fl.*, 626 Fed. Appx. 954, 956 (11th Cir. 2015), *quoting Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*). Instead, "the inquiry into whether an employer's proffered reasons were merely pretextual centers on the employer's beliefs, not the beliefs of the employee or even objective reality." *Lopez v. AT&T Corp.*, 457 Fed. Appx. 872, 874 (11th Cir. 2012); *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266-67 (11th Cir. 2010).

### 1. Conner cannot establish that the April 22, 2019 meeting was a materially adverse action

For purposes of a retaliation claim, an "adverse employment action" is any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).  The Eleventh Circuit has described actionable adverse employment actions as "decisions such as termination, failure to hire, or demotion," *Stavropoulos v. Firestone*, 361 F.3d 610,

617 (11th Cir. 2004); "a serious and material change in the terms, conditions, or privileges of employment," *Davis v. Town of Lake Park, Fla*., 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis omitted); and conduct that "deprives [the employee] of employment opportunities, or adversely affects his or her status as an employee," *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).

Here, Conner claims the April 22, 2019 meeting was retaliatory. Specifically, Conner claims that management at the meeting discussed the proper way for making reports and complaints and that he considered the meeting disciplinary. However, Conner simultaneously and repeatedly admits he was never disciplined during his employment.

Even if Conner's perception of the meeting was correct, the meeting does not rise to the level of a materially adverse employment action. *See Verdi v. City of N.Y.*, 306 F. Supp. 3d 532, 2018 U.S. Dist. LEXIS 10594, at *5 (S.D.N.Y. Jan. 22, 2018) (meeting and subsequent counseling memorandum did not support a Title VII retaliation claim); *See Bhatti v. Trs. of Boston Univ.*, 659 F.3d 64, 73 (1st Cir. 2011) (holding that allegedly undeserved post-complaint reprimands unaccompanied by "tangible consequences" were not materially adverse); *Cole v. Illinois*, 562 F.3d 812, 817 (7th Cir. 2009) (holding that a post-complaint improvement plan indicating that the plaintiff should "become more aware of her tone" was not retaliatory). *Sebastian v. City of Chicago*, 2008 US Dist. LEXIS 60570 (N.D. Ill. July 24, 2008) (verbal

counseling and informal meeting did not rise to the level of materially adverse action); *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1309, 1318 (10th Cir. 2006) (no materially adverse action based on meeting with three members of management in which supervisor became "extremely angry"); *see also Breneisen v. Motorola, Inc.*, 512 F.3d 972, 981-82 (7th Cir. 2008) (no materially adverse action based [**40] on meetings with supervisor in which supervisor questioned reasons for excessive FMLA leave and criticized plaintiff for taking leave); *Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 787 (8th Cir. 2007) (no materially adverse action based on meeting with supervisor even though meeting was "undoubtedly uncomfortable" for plaintiff); *Ahern v. Shinseki*, 2009 U.S. Dist. LEXIS 50214, 2009 WL 1615402, at *6 (D.R.I. June 9, 2009) (no materially adverse action based on required, regular meetings with supervisor in which plaintiff was "berated" did not constitute materially adverse action); *Nolan v. Swartz Campbell, LLC*, 2008 U.S. Dist. LEXIS 15501, 2008 WL 598291, at *20 (W.D. Pa. Feb. 29, 2008) (no materially adverse action based on meeting with supervisor in which plaintiff felt apprehension and intimidated); *Nagle v. RMA, The Risk Mgmt. Ass'n.*, 513 F. Supp. 2d 383, 391 (E.D. Pa. 2007) (no materially adverse action based on "heated" meeting with supervisor which left plaintiff suffering from emotional distress).

Accordingly, because Conner cannot show the meeting was a materially adverse action, his retaliation claim fails.

*ACTIVE 53512988v1*

**2.  <u>Conner cannot establish the necessary casual connection.</u>**

Conner's claims with respect to his suspension also fail because he cannot establish his *prima facie* case.  Specifically, Conner cannot establish a causal connection between his alleged protected activity and his suspension.  As addressed above, Conner must show more than mere temporal proximity.  Conner must offer evidence from which a reasonable jury might conclude that an employer's retaliatory animus was the "but-for" cause of the adverse action.  Conner must show that the desire to retaliate was the but-for cause of the challenged employment action, i.e., Conner must show that the unlawful retaliation would not have occurred without the alleged wrongful action or actions of the employer.  *Nassar*, 570 U.S. 338, at 358-359.

Conner cannot make the requisite showing that MHMHP would not have taken the same decision, but-for his complaints.  Conner submitted complaints to MHMHP verbally in April 2019 and in writing on April 23, 2019.  However, Conner has no evidence that these complaints were in any way causally related to his suspension.  Furthermore, Love, the ultimate decisionmaker in the suspension, did not retaliate against Conner by suspending.  Instead, Love suspended Conner because he walked out of the institution and abandoned his post and patients.

Moreover, there is no evidence that the suspension following the walk-out was based on a retaliatory animus.  Instead, the record is clear that Conner did not

prearrange his leaving early, nor does Conner even know who cared for his patients on the day that he walked out.  Furthermore, Love, the ultimate decisionmaker on the suspension, did not consider any complaints made by Conner, or the fact that the MHPs held a meeting to discuss their concerns, in her decision to suspend the MHPs, including Conner.  Instead, the decision was a result of Conner endangering his mentally ill patients by walking out on them and making no arrangements for their daily care.  Accordingly, Conner cannot make the required but-for showing and, therefore, his *prima facie* case fails.

### 3. **MHMHP had legitimate and nonretaliatory reasons for the meeting and suspension.**

Here, even assuming that Conner could offer evidence demonstrating that Defendants' retaliatory animus was the "but for" cause of the meeting and his suspension and were sufficient to set forth a *prima facie* case, which he cannot, as addressed above, Defendants have legitimate and non-retaliatory reasons.  Conner was asked to attend the meeting to discuss the MHPs concerns, including proper reporting of incidents and complaints.  In addition, Conner was suspended for abandoning his mentally ill patients and was offered a transfer because he did not feel safe at SRCI.

### 4. **Conner cannot prove pretext.**

To establish pretext, Conner must show that the "proffered reason is not the true reason for the employment decision."  *Jackson v. State of Ala. State Tenure*

*Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005).  Moreover, Conner must prove that each and every proffered reason for his suspension and his transfer is a pretext.  If he does not proffer sufficient evidence of pretext regarding each of the defendant employer's articulated reasons, the employer is entitled to summary judgment. *Combs v. Plantation Patterns, Meadowcraft, Inc*., 106 F.3d 1519 (11th Cir. 1997) (there must be "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action").

Conner cannot point to any other individual that walked out on their patients, but who was not suspended.  Conner cannot show that the reason for his suspension was false – Conner admits that he left early and admits that he does not whether his patients were cared for after he left.  Accordingly, Conner cannot carry his burden of demonstrating pretext and summary judgment should be granted in favor of Defendants on Conner's Title VII, Chapter 760, and Section 1981 retaliation claim.

## C.   <u>Count III - Hostile Work Environment.</u>

To establish his claim for a racial or retaliatory hostile work environment, Conner must show that his "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc*., 277 F.3d 1269, 1275 (11th Cir. 2002)

27

(*quoting Harris v. Forklift Sys. Inc*., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)) (internal marks omitted); *Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012) (recognizing claim for retaliatory hostile work environment).

To avoid summary judgment, Conner must present evidence from which a jury could find that he is a member of a protected class; he was subject to unwelcome harassment; the harassment was based on his race or his complaints of discrimination; the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and Defendants are responsible for the harassment under a theory of either direct or vicarious liability. *Adams v. Austal, U.S.A., L.L.C*., 754 F.3d 1240, 1248-49 (11th Cir. 2014); *Edwards v. Prime, Inc.,* 602 F.3d 1276, 1300 (11th Cir. 2010).

Here, Conner alleges that he worked in a racially and retaliatory hostile work environment; however, he admits no one ever made any racist or retaliatory comments to him and that he never even overheard any such comments.  Conner also admits that he was not concerned with how his supervisors treated him "specifically," but rather a concern with other actions with respect to other employees.  Conner alleges that the October 2018 noose incident was an incident that had subjected him to a racially hostile work environment.  However, Conner admits that he did not see the noose.  Moreover, Conner admits that the Officer who

allegedly hung the noose was removed from J-Dorm and that he did not see him again for over 6 months, until April 2019.

Such "through the grapevine or second-hand conduct is not sufficiently severe or pervasive so as to create a hostile work environment." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1046 n.9 (7th Cir. 2000); *Williams v. Ruskin Co., Reliable Div.*, 2012 U.S. Dist. LEXIS 26840, at *14 (M.D. Ala. Mar. 1, 2012) ("[T]he fact that many of the allegations used to bolster [plaintiff's] claims are based on comments and incidents he heard second-hand though his co-workers, and were neither experienced nor witnessed directly by him, weakens the severity of his allegations").

Conner's allegations of a retaliatory hostile work environment are also insufficient as a matter of law. The same actions that form the basis for Conner's retaliation claim appear to form the basis for his retaliatory hostile work environment claim. Specifically, Conner claims he was subjected to a retaliatory environment because of the April 22, 2019 meeting, his July 2019 suspension, and the fact that he was offered a transfer which he believed was unreasonable. These discrete acts, standing alone, cannot form the basis of a hostile work environment claim. *Gowski*, 682 F.3d at 1312 (citing *Davis v. Coca–Cola Bottling Co. Consol.*, 516 F.3d 955, 970 (11th Cir. 2008) ("Discrete acts cannot alone form the *basis* of a hostile work environment claim.") (emphasis in original).

29

Conner's allegations are simply insufficient to establish a *prima facie* case of a racially or retaliatory hostile work environment. *See Washington v. Kroger Co.*, 218 Fed. Appx. 822, 825 (11th Cir. 2007) (no hostile environment when co-worker allegedly hung a plastic figurine representing the employee with a rope and called him names such as "boy"); *Ray v. Lee Brass Foundry, LLC*, 2017 U.S. Dist. LEXIS 212715 (N.D. Fla. Sept. 19, 2017) (the plaintiff's relationship to the rope was too tenuous where "a rope fashioned as a noose was seen hanging in the maintenance area at Lee Brass. Many of the employees were 'distraught' about it. Plaintiff never saw the noose while it was hanging, but she did 'glance[] at it' after it had been taken down and was about to be thrown in the trash"). Accordingly, Conner simply cannot establish that under the totality of the circumstances, the conduct was sufficiently severe and pervasive. *See Cunningham v. Austal, US.A., L.L.C*, 2011 U.S. Dist. LEXIS 100567, at *6 (S.D. Ala. Sept. 7, 2011) ("[t]he Eleventh Circuit has not held that the temporary display of a noose by a rogue employee creates a per se hostile work environment").

**D.    Conner Was Not Constructively Discharged**

To the extent that Conner is attempting to assert a claim for constructive discharge,[4] a constructive discharge occurs when an employer "deliberately makes

---

[4] Conner does not specifically assert a constructive discharge in his Complaint, although he alleges he resigned "due to the discrimination, harassment, and retaliation to which he had been subjected and Defendants' failure to provide a safe

an employee's working conditions intolerable and thereby forces him to quit his job." *See Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (*quoting Munday v. Waste Mgmt. of N. Am.*, 126 F.3d 239, 244 (11th Cir. 1996)).  Courts ask if the work environment is "so unbearable that a reasonable person . . . would be compelled to resign." *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350,1363 (11th Cir. 1994).  A plaintiff's subjective feelings are irrelevant.  *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) ("[i]n evaluating constructive discharge claims, we do not consider the plaintiff's subjective feelings").

The standard for constructive discharge is "quite high."  *Id.*  It is even higher than the hostile-work-environment standard.  *See Penn. State Police v. Suders*, 542 U.S. 129, 134, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004).  Along with showing harassment altered the terms and conditions of his employment, a plaintiff must show "a causal link between the allegedly intolerable conditions and [his] resignation." *Green v. Brennan*, 136 S. Ct. 1769, 1781, 195 L. Ed. 2d 44 (2016).  Furthermore, a plaintiff must give his employer enough time to remedy the situation before resigning.  *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) ("[a] constructive discharge claim will generally not be found if the employer is not given sufficient time to remedy the situation").

---

and hostile work environment-free work environment."  Further, at his deposition, Conner testified the proposed transfer was "an unreasonable accommodation." [Doc. 29-1, 164: 24-165:3].

31

Here, Conner resigned on August 1, 2019, alleging that he had been subjected to "consistent harassment, discrimination, and retaliation from Centurion's administrators and DOC leadership" and was "given the option to resign, be fired or take a position at another facility that is more than an hour from [his] home." [Doc. 29-24].

Despite Conner's statements, Conner has failed to show that he was subjected to any harassment, discrimination or retaliation during his employment as discussed above.  To the contrary, Conner effectively forced his own transfer from SRCI by repeatedly stating that he did not feel safe working there, ostensibly because of the presence of FDOC Officers over whom neither Centurion nor MHMHP had any control whatsoever with respect to placement. But, when MHMHP offered him the opportunity to transfer to another facility, he declined and resigned. Conner cannot show "a causal link between the allegedly intolerable conditions and [his] resignation." *Green*, 136 S. Ct. at 1781.  Conner's resignation was precipitated by his own actions and statements that he did not feel safe.

Accordingly, for these reasons as well as the same reasons his hostile work environment claim fails, his constructive discharge claim likewise fails.

## III.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court enter an Order granting summary judgment in their favor.

## <u>CERTIFICATE OF WORD LIMIT</u>

I hereby certify that there are 7,137 words in this document and that it has been typed in 14-point font.

Respectfully submitted,

/s/Catherine H. Molloy
Richard C. McCrea, Jr.
Florida Bar No. 351539
Email: mccrear@gtlaw.com
Catherine H. Molloy
Florida Bar No. 003500
Email: molloyk@gtlaw.com
Cayla M. Page
Florida Bar No. 1003487
Email: pagec@gtlaw.com
GREENBERG TRAURIG, P.A.
101 E. Kennedy Boulevard
Suite 1900
Tampa, FL  33602
Telephone:  (813) 318-5700
Fax:  (813) 318-5900
*Attorneys for Defendants*

33

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been

electronically transmitted using the CM/ECF System for filing and transmittal to the

following ECF registrant(s) on this November 5, 2020 to:

Gaye L. Huxoll
TEIN MALONE PLLC
3059 Grand Avenue
Coconut Grove, FL 33133
ghuxoll@teinmalone.com
fchiong@teinmalone.com

/s/Catherine H. Molloy
Attorney

*ACTIVE 53512988v1*